**Bruno George Joseph JOURNE, Petitioner,**

**v.**

**Liselie JOURNE a/k/a Liselie Soto Ramos, Respondent.**

**Civil No. 95–1729 (SEC).**

United States District Court, D. Puerto Rico.

Nov. 29, 1995.

44

Juan R. Acevedo, Hato Rey, PR, for petitioner.

Manuel Moraza–Choisne, Cond. LeMans, Hato Rey, PR, for respondent.

### ORDER

CASELLAS, District Judge.

Petitioner Bruno George Joseph Journe ("petitioner") ("Dr. Journe") originally brought this action on June 9, 1995, pursuant to The Hague Convention on International Child Abduction ("the Convention") and the International Child Abduction Remedies Act, 42 U.S.C. § 11601 et seq., seeking the return of his three minor children, allegedly wrongfully removed and retained by his wife, respondent Liselie Soto Ramos ("respondent") ("Ms. Soto"). In accordance with the mandate contained in Article 11 of the 1980 Hague Convention on the Civil Aspects of International Child Abduction for the expeditious resolution of proceedings brought under its provisions, a hearing on the merits of Dr. Journe's petition was scheduled for August 8, 1995. In addition, the Court granted petitioner's interim request (docket # 3) for an order prohibiting Liselie Soto Ramos

from further removing or concealing the three minors identified in the complaint as petitioner's children, pending final disposition of this action. See 42 U.S.C. § 11604(a).

On August 8, 1995, counsel for the parties informed the Court that petitioner had been unable to make the appropriate travel arrangements and could not appear to testify on his own behalf. Accordingly, the Court proceeded to hear arguments from both counsel with respect to a motion to dismiss and/or for summary judgment filed by respondent in open court, but gave petitioner fifteen (15) days to respond in writing to the motion. On motion by respondent, the Court also expanded the scope of its Order granting petitioner's interim request to include a reciprocal prohibition against petitioner, and so as to provide that any visit or contact between the children and petitioner be conducted under the Court's supervision.

Finally, the case was called for a hearing on the merits on September 22, 1995. After denying respondent's motion to dismiss and/or for summary judgment, the Court proceeded to hear testimony by Dr. Journe, Ms. Soto and Dr. Nydia Lucca Irizarry.[1] The Court ordered both parties to file simultaneous post-trial briefs by October 13, 1995, and the parties have complied. The case is therefore deemed submitted. Now, having carefully examined the evidence of record, including the testimony offered by the parties and respondent's expert, the Court hereby rules as follows:

### Findings of Fact

The parties were married on August 6, 1985 in Paris, France. They have three children: Gabriel Henry Maxime Journe, born January 1st, 1989 in Les Lila, France; Laura Marie Elizabeth Journe, born July 27, 1990 in Paris, France; and Anna Marie Isabelle Emilliene Journe, born August 12, 1993 in Paris, France. All three are French citizens. Except for a holiday in Spain during the Christmas season of 1993 and two trips to Puerto Rico to visit family, the minors have always lived in Paris.

---

**1.** The Court also denied petitioner's motion *in limine,* which sought to preclude respondent

from presenting in evidence Dr. Lucca Irizarry's report and testimony.

The testimony presented at trial by both parties established that by 1994, their relationship had markedly deteriorated to the point that around February and early March 1994, they had agreed to separate. There is credible evidence in the record to suggest that in the time before their separation, Ms. Soto was subject to physical and emotional abuse by her husband. Even during their separation however, Dr. Journe continued to visit his children, taking them to school in the morning, and for walks in the park or to the movies on some afternoons and weekends. In fact, Ms. Soto acknowledged during her testimony that Dr. Journe was a loving and caring father. As Ms. Soto was a homemaker, Dr. Journe provided his wife and children with rent, food, clothing, a car, and approximately $200.00 a week, as well as a cleaning maid.

On June 13, 1994, Dr. Journe filed suit in the Tribunal de Grande Instance of Paris seeking a divorce from Ms. Soto and exclusive custody rights over their children. This complaint also asked that Ms. Soto be required to pay child support.

During the weekend of June 30th to July 3rd, petitioner took his children on a trip to his family home in the South of France, and deliberately withheld from Ms. Soto the children's whereabouts. They eventually returned on July 4, 1994. Then, on July 5, 1994 Ms. Soto left France with the three children and came to Puerto Rico, where they have resided ever since. Petitioner, for his part, learned of the children's location two days later, and has maintained contact with them through the telephone, the mail, and twice visited them personally.

On October 24, 1994, petitioner filed a request with the French Central Authority for the return of the children to France, pursuant to the provisions of the Convention. The underlying basis for Dr. Journe's request was the pending action for divorce, as evidenced by the fact that attached to his request to the French Central Authority was a copy of the complaint filed in that case.

Significantly, on November 17, 1994 Ms. Soto voluntarily appeared at a duly scheduled hearing before the French Court handling the divorce and custody proceedings.

At that time she voluntarily submitted to the jurisdiction of the Court and, assisted by her lawyer, proceeded to contest Dr. Journe's request. Shortly after this hearing, on November 22, 1994, Dr. Journe sent a personal letter to the presiding judge requesting the voluntary dismissal of the complaint for divorce. In that letter he states that the parties had reconciled and that Ms. Soto had agreed to return to the marital home. During his testimony, Dr. Journe explained that the alleged reconciliation took place over the telephone, during an evening conversation lasting approximately thirty (30) seconds. He admitted that the only contact he had with Ms. Soto while she was in Paris for the hearing was in fact at the hearing, and that the phone conversation occurred after she was already back in Puerto Rico. Ms. Soto vigorously denied that any such reconciliation had taken place, or that she ever made any promises to return. Having carefully weighed the conflicting testimony, and taking into account the demeanor and reasonableness of the witnesses' explanations, it is clear that no such reconciliation could have occurred in the circumstances described by petitioner. Therefore, his testimony regarding the alleged 30-second reconciliation is not credible. In any case, the French Court on November 24, 1994 dismissed the complaint per Dr. Journe's request. Ms. Soto, predictably, did not return to France.

Meanwhile, Dr. Journe's petition under the Convention continued to be processed through the French Central Authority, notwithstanding his voluntary dismissal of the divorce and custody proceedings upon which it was originally based. To this end, on November 10, 1994, prior to the dismissal of the court proceedings in France, the French Ministry of Justice forwarded the required documentation to the United States Department of State. While his petition was pending, Dr. Journe came to Puerto Rico in December, 1994 and exhibited toward Ms. Soto the same hostile attitude that led to their marital problems. These events culminated with the filing of the instant complaint on June 9, 1995.

Finally, respondent presented the expert testimony of Dr. Nydia Lucca, a clinical psy-

chologist trained at Harvard University, who testified as to the potentially deleterious consequences that a decision forcing the children to return to France would have on them. Dr. Lucca testified that during the past fourteen (14) months, the children have developed deep emotional ties to significant others in their new milieu, linked to their mother's rearing patterns. She also testified that they had established daily routines which give a sense of organization and stability to their lives. She further observed that the children had developed habits, relationships and activities which give meaning to their existence, to such an extent that they behave like normal and typical Puerto Rican children. She concluded that if they were ordered to return to France, they would be put in an unbearable situation, to such an extent that they would be at serious risk of emotional damage.

### Conclusions of Law

We are called to apply the provisions of the 1980 Hague Convention on the Civil Aspects of International Child Abduction, as implemented by the International Child Abduction Remedies Act ("the Act"), 42 U.S.C. § 11601 et seq. This Court has jurisdiction over this matter by virtue of section 4(a) of the Act, 42 U.S.C. § 11603(a), which gives the United States district courts concurrent jurisdiction over actions arising under the Convention.

The purpose of the Convention is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." See Currier v. Currier, 845 F.Supp. 916, 920 (D.N.H.1994). To this end, the Convention sets forth a carefully delineated analytical framework for the application of its provisions. In accordance with these procedures, courts within signatory countries are to determine whether the children have been wrongfully removed from their place of habitual residence, and are not to overstep the scope of their authority by delving into and attempting to resolve an underlying custody dispute. Hague Convention, Art. 19; 42 U.S.C. § 11601(b)(4). Both the United States and France are signatories to the Convention.

The Act requires petitioner to establish by a preponderance of the evidence that the child has been wrongfully removed within the meaning of the Convention. See 42 U.S.C. § 11603(e)(1)(A). According to the Convention, wrongful removal occurs when the child is removed, in violation of the rights of custody of petitioner, from the state of habitual residence of the child. Hague Convention, Art. 3. A second requirement is that the rights to custody must have been actually exercised at the time of the removal. Id. A respondent who opposes the return must establish by clear and convincing evidence that an exception set forth in Article 13b or 20 of the Convention applies. 42 U.S.C. § 11603(e)(2)(A). Article 13b provides that return need not be ordered if the person opposing such return establishes that there is a grave risk that it would expose the children to physical or psychological harm, or otherwise place them in an intolerable situation. Otherwise, respondent must establish by a preponderance of the evidence that any other exception found in articles 12 and 13 of the Convention apply. 42 U.S.C. § 11603(e)(2)(B).

Ms. Soto presents this Court with a rather novel argument, which distinguishes this particular controversy from any other reported case on the subject. She argues that the Convention should not be applicable to these facts because petitioner, having had the opportunity to litigate the custody issue in France, proceeded of his own free will to renounce those rights by asking and obtaining from the French courts the dismissal of the case. For the reasons that follow we accept respondent's argument, and hold that petitioner has waived his rights under the Convention.

As noted above, the purpose of the Convention is to return the children to their country of habitual residence for resolution of any custody dispute. The remedy under the Convention mirrors its purpose: the child is ordered returned and any dispute over custody is litigated in the place of habitual residence. This remedial scheme reveals the underlying premise of the Convention; that the country in which the child habitually resides should be the forum for a decision

concerning the custody of that child. *See* Silberman, *Hague Convention on International Child Abduction: A Brief Overview and Case Law Analysis,* 28 Fam.L.Q. 9, 10–11 (1994).

Ms. Soto does not dispute the fact that the children were habitual residents of France until November of 1994 or that any custody dispute had to be litigated there. Rather, Ms. Soto argues persuasively that what the Convention seeks to guarantee, namely the opportunity for the judicial authorities of the country of habitual residence to decide the merits of a custody dispute, is precisely what occurred in this case. Dr. Journe filed his complaint for divorce seeking custody of the three children on June 13, 1994 before the Tribunal de Grande Instance in Paris. In response, Ms. Soto voluntarily submitted to the jurisdiction of that court, and appeared before the presiding judge at the scheduled hearing to contest Dr. Journe's demand for custody. Put another way, petitioner already had on November 17, 1994 what he now seeks this Court to return to him: a French judicial forum, selected by him, fully capable of deciding the merits of his claim for custody under French law.

Notwithstanding the above circumstances, it is undisputed that petitioner, out of his own free will, voluntarily dismissed his divorce and custody action then pending before the French court. We have already rejected his claim that the dismissal was due to a transoceanic reconciliation which occurred during a 30–second telephone conversation as not credible under the circumstances of this case. Respondent, for her part, offers a plausible explanation for petitioner's letter to the French court urging the dismissal of his complaint, suggesting that petitioner, through the letter, attempted to avoid the prospects of an unfavorable ruling from the court regarding the custody of the children. Whatever his reasons however, the end result is that as a direct consequence of petitioner's own actions, there is no longer a pending proceeding in the French courts involving the custody of the Journe children.

Ms. Soto argues that because Dr. Journe's petition under the Hague Convention was predicated on the divorce and custody proceedings then pending before the Tribunal de Grande Instance, the voluntary dismissal of the action for divorce now bars him from further pursuing his "ancillary" claim under the Convention. This argument overlooks the fact that by its terms, the Convention itself imposes no requirement that there be an underlying custody proceeding pending in the courts of the state of habitual residence as a necessary prerequisite to the application of its provisions. Respondent nevertheless urges this Court to exercise its equitable powers to deny petitioner the relief he seeks, on the grounds that having by his own actions secured the dismissal of the divorce and custody proceedings before the Tribunal de Grande Instance in Paris, he should now be estopped from attempting to gain through the Convention a second opportunity to litigate these same custody issues before the same French courts.[2]

Although respondent's theory is purportedly one for the application of the equitable doctrine of estoppel, her arguments as summarized above are more accurately characterized as raising an issue of waiver. Waiver is defined as the intentional or voluntary relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right. *See* Black's Law Dictionary 1580 (6th ed. 1990). *See also, Irons v. F.B.I.,* 811 F.2d 681, 686 (1st Cir. 1987).[3] According to the First Circuit's decision in *Irons,* a valid waiver of a legal right requires both knowledge of its existence and an uncoerced intent to relinquish it. *Id.* at

**2.** At least one other federal court has made use of its equitable powers to deny a petitioner his relief under the Convention and ICARA. *See In re Prevot,* 59 F.3d 556 (6th Cir.1995).

**3.** The doctrine of waiver has deep historical roots in the Civil Law as well. In Puerto Rico, it is codified in Article 4 of the Puerto Rico Civil Code, 31 L.P.R.A. § 4: "Rights granted by the laws may be renounced, provided such renunciation be not contrary to law, to public interest or public order, or prejudicial to the interest of a third person." For a complete discussion of this issue in the context of the Civil Law tradition, *see* Puig Brutau, Fundamentos de Derecho Civil, 2da ed. rev., Barcelona, Ed. Bosch, 1989, T. Prel., pág. 347–53.

48

686. In addition, every waiver need not be express; "at times, one can fairly be deduced from conduct or from a collocation of circumstances." *Id.* (citing *Matter of Garfinkle,* 672 F.2d 1340, 1347 (11th Cir.1982). Nevertheless, if proof of a waiver rests upon one's acts, these acts should be so manifestly consistent with and indicative of an intent to relinquish voluntarily a particular right that no other reasonable explanation of this conduct is possible. *Irons,* 811 F.2d at 686 (quoting *Bechtel v. Liberty National Bank,* 534 F.2d 1335, 1340 (9th Cir.1976); *Buffum v. Chase National Bank of City of New York,* 192 F.2d 58, 61 (7th Cir.1951), *cert. denied,* 342 U.S. 944, 72 S.Ct. 558, 96 L.Ed. 702 (1952)).

■ Dr. Journe's voluntary dismissal of his action for divorce and custody of the children acts as a waiver of his rights under the Convention. Throughout this process, his petition to the French Central Authority was premised on the underlying action for divorce then pending before the French courts. His remedy under the Convention would put him in the same position he was on November 17, 1994. Once again, he would have his choice of a French forum to decide the custody issues under French law, as contemplated by the Convention. Given these circumstances, his voluntary dismissal of the action for divorce can only be characterized as indicative of an intent to relinquish his rights to have the custody issues decided by the courts of France. *Irons,* 811 F.2d at 686. No other reasonable explanation of his conduct is possible.[4] Having eschewed this opportunity to resolve the custody dispute in his native France, we hold that Dr. Journe has waived his right to pursue a claim under the Convention, and therefore dismiss the complaint in this case. Judgment shall be issued accordingly.

**SO ORDERED.**

---

4. We have already discounted Dr. Journe's purported reason for requesting the voluntary dismissal of his petition for divorce, namely that a reconciliation occurred via telephone during a thirty-second conversation. He has offered no other explanation for his actions.