Evelyn **GONZALEZ–CABALLERO,**
Plaintiff–Appellant,

v.

Ramon Eduardo **MENA,**
Defendant–Appellee.

No. 00–15822.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 23, 2001

Filed May 30, 2001

Hector M. Figueroa, Hector M. Figueroa and Associates, Tucson, Arizona, for the plaintiff-appellant.

Joseph J. DeFrancesco, Sierra Vista, Arizona, for the defendant-appellee.

Before: T.G. NELSON, HAWKINS, and TALLMAN, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge:

Evelyn Gonzalez–Caballero appeals the district court's denial of her petition to return her daughter, Danelsy, to her custody in Panama. The district court found that Gonzalez–Caballero consented to the removal and retention of Danelsy from Panama to Arizona by Danelsy's father, Ramon Mena, an American citizen. Because this decision was based on a correct application of the Hague Convention on the Civil Aspects of International Child Abduction ("the Hague Convention"), incorporated into United States law as the International Child Abduction Remedies Act ("the Act"), 42 U.S.C. §§ 11601–11610, our review is limited to determining whether the district court's findings of fact were in clear error. Because they were not, we affirm the denial of Gonzalez–Caballero's petition.

## FACTS AND PROCEDURAL HISTORY

Danelsy Sofia Mena–Gonzalez was born in Panama on March 14, 1997, to Evelyn Gonzalez–Caballero, a Panamanian citizen, and Ramon Mena, an American citizen. Gonzalez–Caballero and Mena were not married at her birth, and have not married since. They met, and briefly lived togeth-

er, while Mena was stationed in Panama. Mena left Panama before Danelsy's birth, and was not named as Danelsy's father on her original birth certificate; but, upon learning of her birth, Mena traveled to Panama where both he and Gonzalez–Caballero acknowledged his paternity and amended Danelsy's birth certificate to list him as her father.

While in Panama, Mena acquired a certificate of "Consular Report of Birth Abroad," which secured Danelsy's United States citizenship, began the process to obtain Danelsy's United States passport, and secured a military identification card so Danelsy could receive military dependency privileges. From her birth through October 1999, Danelsy lived with Gonzalez–Caballero in Panama; during this time, Mena sent clothing and support from the United States.

In late September or early October 1999, Mena and Gonzalez–Caballero conversed about Danelsy over the telephone. According to Mena, Gonzalez–Caballero told him that she was pregnant again, that the father of her unborn child had left her, and that she could no longer adequately care for Danelsy. According to Gonzalez–Caballero, she and Mena discussed plans for Mena, Gonzalez–Caballero, and Danelsy to travel to the United States together.

At the time of this telephone conversation, Mena was just about to sign a contract to work in Honduras. Upon signing the contract, Mena was to receive a $1500 advance for travel expenses. After speaking with Gonzalez–Caballero, Mena signed the contract and used the advance to purchase a round-trip ticket for himself to Panama and a one-way ticket from Panama to the United States for Danelsy.

Upon his arrival in Panama City in early October 1999, Mena was met by Gonzalez–Caballero and Danelsy, who traveled there by bus from Gonzalez–Caballero's home-

town. They stayed together in a hotel, where Mena told Gonzalez–Caballero that he would try to help her legally immigrate to the United States if she made the preliminary arrangements through her sister, who lives in Georgia as a resident alien. According to Mena, they also discussed Danelsy's welfare, concluding that she would have a better life in the United States.

Gonzalez–Caballero's account of the events at the hotel is somewhat confused. At various times, Gonzalez–Caballero has claimed that she agreed to allow Mena to take Danelsy to the United States for two weeks until she could get the proper paperwork to join her daughter; at other times, she claims an agreement with Mena under which she allowed him to remove and retain Danelsy provided he help her immigrate to the United States, at which time she would reassume custody. It is undisputed that Gonzalez Caballero gave Mena all of Danelsy's legal documents— her birth certificates, the Consular Report, her United States passport, and her military identification card.

The next day, Gonzalez–Caballero accompanied Mena and Danelsy to Panamanian government offices to obtain the paperwork required for Danelsy's exit from Panama. Gonzalez–Caballero then saw Mena and Danelsy off at the Panama City airport, as they departed for the United States.

According to Gonzalez–Caballero, she became worried the day after Mena and Danelsy left when Mena did not call upon his arrival in the United States, as he had promised. Concerned, Gonzalez–Caballero consulted Panamanian child custody authorities and the police. A few days later, upon returning home from Panama City, Gonzalez–Caballero also contacted her local police department for advice. When

Gonzalez–Caballero and Mena spoke telephonically a few days later, Mena reiterated his willingness to help Gonzalez–Caballero immigrate to the United States, but also told her that she needed to arrange her immigration through her sister.

Gonzalez–Caballero testified that the next day she went to the Panama City police, the United States Judge Advocate General Corps liaison, and the Institute for Children. Gonzalez–Caballero said that she learned she was pregnant on October 14.[1] Around November 19, Gonzalez–Caballero went to the office of the Panamanian President, Panamanian radio stations, and the Children's Commission seeking assistance in recovering Danelsy. The office of the President gave Gonzalez–Caballero permission to travel to the United States and provided her with an airline ticket.

Gonzalez–Caballero arrived at a Houston, Texas airport on March 9, 2000. Upon her arrival, I.N.S. contacted Mena and told him that, as Gonzalez–Caballero was without money or domestic travel tickets, she would be returned to Panama unless he provided funds for her further travel.[2] Mena immediately arranged for Gonzalez–Caballero to fly to his brother's home in San Antonio, Texas, where she stayed for about a week.

Mena then arranged for Gonzalez–Caballero to travel by bus from San Antonio to Tucson, Arizona, where she was met by another of Mena's brothers, who took her to his home.[3] When Mena met Gonzalez–Caballero later that day, she told him she wanted to take Danelsy and, if she could stay in the United States, he could visit her. Mena told Gonzalez–Caballero that

Danelsy was doing well in her new home and refused to allow her to take Danelsy back to Panama.

On April 6, 2000, Gonzalez–Caballero filed a Petition for Return of Child in the district court pursuant to the Hague Convention and under the Act. The district court held an evidentiary hearing and issued a brief, preliminary order denying Gonzalez–Caballero's petition. About four weeks later, the district court issued a longer, more detailed order reaching the same result. Gonzalez–Caballero timely appealed both the denial of her petition and the district court's refusal to amend its order. We have jurisdiction under 28 U.S.C. § 1291.

## STANDARDS OF REVIEW

 The district court's conclusions of law are reviewed de novo. *Cigna Prop. and Cas. Ins. Co. v. Polaris Pictures Corp.*, 159 F.3d 412, 418 (9th Cir.1998). Conclusions of international law are also reviewed de novo. *Shalit v. Coppe*, 182 F.3d 1124, 1127 (9th Cir.1999). A district court's findings of fact are reviewed under the clearly erroneous standard. Fed. R.Civ.P. 52(a); *Diamond v. City of Taft*, 215 F.3d 1052, 1055 (9th Cir.2000). An appellate court must accept the lower court's findings of fact unless the appellate court is left with the definite and firm conviction that a mistake has been committed. *United States v. Beard*, 161 F.3d 1190, 1194 (9th Cir.1998).

## ANALYSIS

Article 3 of the Hague Convention states, in pertinent part:

1. Mena claims that she told him she was pregnant during the earlier initial telephone conversation that prompted his trip to Panama.

2. I.N.S. initially contacted Gonzalez–Caballero's sister, who stated that she was unable to

provide any funds for Gonzalez–Caballero's travel.

3. Mena testified that he attempted to meet Gonzalez–Caballero personally, but could not be away from work when she arrived.

The removal or the retention of a child is to be considered wrongful where—

a. it is a breach of rights of custody attributed to a person ... under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b. at the time of the removal or retention those rights were actually exercised ... or would have been so exercised but for the removal or retention.

The rights of custody mentioned in subparagraph a above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

It is not disputed that Mena removed Danelsy from Panama and retained her in the United States or that Gonzalez–Caballero was exercising custody rights in Panama at the time of the removal and retention. Nevertheless, Gonzalez–Caballero's petition must be rejected if an exception found at Article 13 of the Hague Convention applies:

[T]he judicial or administrative authority ... is not bound to order the return of the child if the person ... [who] opposes the return establishes that—

a. the person ... having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, *or had consented to* or subsequently acquiesced in *the removal or retention* . . . .

(emphasis added). This defense is established by a preponderance of the evidence, with the burden of persuasion on the defendant. 42 U.S.C. § 11603(e)(2)(B).

The district court found that a preponderance of the evidence showed that Gonzalez–Caballero consented to Mena's removal and retention of Danelsy, triggering Article 13.

■ The district court undertook a careful parsing of the evidence to support this conclusion. First, there was no evidence that Gonzalez–Caballero objected to Danelsy becoming an American citizen. Second, Mena's testimony that Gonzalez–Caballero told him that she had a problem—that she was pregnant and her boyfriend had left her—was believable. Third, none of the witnesses other than Gonzalez–Caballero (including Gonzalez–Caballero's own mother and sister) testified that they knew anything about Danelsy's visit being temporary. Fourth, it made no sense for Mena to use his travel advance to come to Panama to get Danelsy for just a short visit. Fifth, Gonzalez–Caballero provided Mena with all of Danelsy's paperwork, not just the paperwork necessary for her to travel to the United States for a brief visit, and assisted Mena in procuring exit papers for Danelsy from the Panamanian authorities. Sixth, Gonzalez–Caballero's testimony about "regretting" her decision to let Mena take Danelsy immediately after their departure and visiting the authorities so soon after their departure makes no sense if Danelsy was to have been gone only briefly and Mena's lone transgression was neglecting to telephone her upon their arrival in the United States. Seventh, Gonzalez–Caballero's mother testified that Gonzalez–Caballero told her that she regretted turning over custody to Danelsy but was desperate due to her pregnancy. Finally, Mena's intervention to keep Gonzalez–Caballero in the United States shows that he did not fear her visit, as he likely would have if he was wrongfully retaining Danelsy.

The district court found Gonzalez–Caballero's claim that she only authorized a temporary removal inconsistent with the facts, and determined that Mena's testimony was both credible and consistent. Gonzalez–Caballero argues that the district

court's finding of fact as to her consent to Mena's removal and retention of Danelsy was clearly erroneous in light of her conduct after Danelsy's departure. She contends that her post-departure conduct shows that she rescinded or revoked her consent to Mena's removal and retention of Danelsy.[4]

Gonzalez–Caballero's argument is flawed. It conflates ex ante consent and ex post acquiescence when either alone extinguishes a right of return under the Hague Convention. Under Article 13, the right to a child's return secured by the Hague Convention is extinguished if "the person ... having the care of the child," here Gonzalez–Caballero, "consented to *or* subsequently acquiesced in the removal or retention ...." (emphasis added). Under the Hague Convention's plain, unambiguous language, consent before the removal and retention *or* subsequent acquiescence extinguishes the right of return.

Here, the district judge specifically found that Gonzalez–Caballero consented ex ante to Danelsy's removal and retention by Mena. Thus, the district court did not err by not addressing Gonzalez–Caballero's argument that she did not subsequently acquiesce or that she revoked her consent—once the district court found ex ante consent, its inquiry was complete because even ex post non-acquiescence could not revive her right of return under the Convention.

The few published cases construing the Convention support this result.[5] In *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir.1996), the Sixth Circuit explicitly divided the consent and acquiescence inquiries, proceeding to analyze subsequent acquiescence only after concluding that "the district court did not abuse its discretion in finding that Mrs. Friedrich took [the child] to America without Mr. Friedrich's consent." Likewise, in *Levesque v. Levesque*, 816 F.Supp. 662, 667 (D.Kan.1993), the district court focused solely on ex post acquiescence, maintaining a division between the ex ante consent and ex post acquiescence analyses.

Of course, conduct after removal can be useful in determining whether consent was present at the time of removal. The court in *Wanninger v. Wanninger*, 850 F.Supp. 78, 81–82 (D.Mass.1994), engaged in just this inquiry, looking to a father's post-removal letters to determine whether he had consented ex ante to retention by the mother. *Wanninger*'s methodology was followed in this case—the district judge considered Gonzalez–Caballero's post-removal conduct and nevertheless found that, under the preponderance of the evidence, Gonzalez–Caballero consented to Danelsy's removal and retention by Mena. Gonzalez–Caballero disputes this factual finding, but the district judge properly considered Gonzalez–Caballero's post-removal conduct insofar as it spoke to her ex

4. Though Gonzalez–Caballero's story shifts, one version advanced in her brief is that she had a conditional agreement with Mena under which she allowed him to remove and retain Danelsy in exchange for his assistance in her immigration to the United States. As discussed above, the district judge made a factual finding rejecting the existence of such an agreement.

5. One case, *Currier v. Currier*, 845 F.Supp. 916, 922 (D.N.H.1994), implicitly conflates the consent and subsequent acquiescence in-

quiries, losing the ex ante focus of the consent inquiry and ex post focus of the subsequent acquiescence inquiry. ("[R]espondent argues that the agreement at least evidenced petitioner's intent to relinquish her custody rights and obligations, which should be construed as consent to or acquiescence in the removal."). Based on the plain language of the Convention, and in accord with the other scarce precedent construing this Article, we reject *Currier*'s implicit conflation of consent and subsequent acquiesence.

ante consent. The district court employed the correct methodology under the Convention and, given all of the evidence before the district court, we cannot say that its factual finding of consent was clearly erroneous.

### CONCLUSION

This case is tragic—we have two parents who both appear to love and cherish their daughter. Under the Convention, Gonzalez–Caballero lost her right to petition for Danelsy's return when she consented to Mena's removal and retention of her. Though Gonzalez–Caballero vigorously contests the district court's factual findings, under these circumstances we cannot say that the district court clearly erred in finding her consent. The district court considered all of the facts, both those arising before Danelsy's removal from Panama and those arising after, and made a considered decision in line with the Convention.

The district court's denial of Gonzalez–Caballero's Petition for Return of Child is AFFIRMED.