**In the Interest of J.J.L.-P., a child.**

No. 04–07–00080–CV.

Court of Appeals of Texas, San Antonio.

Feb. 13, 2008.

Marcel C. Notzon, III, Craig A. Lawrence, The Notzon Law Firm, Laredo, TX, for Appellant.

Norma Nelly Vielma, Law Office of Norma Nelly Vielma, Laredo, TX, for Appellee.

Sitting: CATHERINE STONE, Justice
SANDEE BRYAN MARION, Justice
PHYLIS J. SPEEDLIN, Justice.

## OPINION

Opinion by: CATHERINE STONE, Justice.

Jesus Jurado–Galaz filed a petition pursuant to the Hague Convention on Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act, *see* 42 U.S.C. §§ 11601 *et seq.*, seeking the return of his minor child, J.J.L.-P., to Mexico after J.J.L.-P. was allegedly wrongfully retained in the United States by Susana and David Cruz (collectively "the Cruzes"). The trial court determined the Cruzes wrongfully retained J.J.L.-P. when he came to Texas for a visit, and ordered the Cruzes to return J.J.L.-P. to Mexico and to pay Jurado–Galaz's attorney's fees. We affirm.

### BACKGROUND

J.J.L.-P. was born on April 10, 2000 in Nuevo Laredo, Mexico. J.J.L.-P.'s parents, Jurado–Galaz and Susana, moved to Laredo, Texas after J.J.L.-P.'s birth. Although they never married, Jurado–Galaz and Susana purchased a home together in Laredo, where they lived together until October 2001. In October 2001, the couple separated, and Jurado–Galaz returned to Guadalajara, Mexico. J.J.L.-P. remained in the United States with Susana and continued to live with her in Laredo until August 2004, when Susana and Jurado–Galaz agreed for J.J.L.-P. to return to

Mexico to live with Jurado–Galaz.[1]

From August 2004 until December 2005, J.J.L.-P. lived with Jurado–Galaz and attended school in Guadalajara, Mexico. In December 2005, Jurado–Galaz agreed for J.J.L.-P. to travel to the United States with Susana and her husband, David, whom she had met and married in 2004, for what Jurado–Galaz believed to be a visit for the holidays. Susana and David, however, intended to permanently retain J.J.L.-P. so that they could begin his legal immigration into the United States.

The Cruzes went to Mexico for J.J.L.-P. on December 3, 2005 and returned with him to Texas. On December 28, 2005, Jurado–Galaz spoke with Susana and was told that Susana did not intend to return J.J.L.-P. to Mexico. Jurado–Galaz promptly came to Texas to look for J.J.L.-P. after he learned about Susana's intention not to return the child to him. Jurado–Galaz, however, could not successfully locate J.J.L.-P. because Susana had relocated and would not reveal her whereabouts to him.

On January 4, 2006, Jurado–Galaz obtained legal counsel and filed a custody action in the 406th Judicial District Court of Webb County, Texas to secure the return of J.J.L.-P. to Mexico. When Jurado–Galaz returned to Mexico after filing his custody action, he learned about his rights under the Hague Convention from the Central Authority in Jalisco, Mexico.[2] Jurado–Galaz then filed a Hague Convention petition in the 406th Judicial District Court of Webb County, Texas seeking the return of J.J.L.-P. to Mexico on July 19, 2006, and secured an order staying all further proceedings in his custody action.

On August 16, 2006, the trial court held a final hearing on Jurado–Galaz's Hague Convention petition. The trial court took judicial notice of the testimony it had heard throughout the proceedings as well as the affidavits and other evidence filed by the parties. After considering all of the evidence before it, the trial court determined: (1) J.J.L.-P.'s habitual residence was Guadalajara, Mexico prior to his retention by the Cruzes; (2) the Cruzes' retention of J.J.L.-P. breached the rights of custody attributed to Jurado–Galaz under the laws of Jalisco, Mexico; and (3) Jurado–Galaz was exercising his custody rights under the laws of Jalisco, Mexico at the time of J.J.L.-P.'s retention. The court rejected the jurisdictional challenge and defenses presented by the Cruzes and ordered the Cruzes to return J.J.L.-P. to Mexico. The trial court, on January 11, 2007, entered an order awarding Jurado–Galaz $15,000 for his attorney's fees and entered findings of fact and conclusions of law in support of its attorney's fees award.[3] The Cruzes appeal, challenging the trial court's orders returning J.J.L.-P. to Mexico and awarding Jurado–Galaz his attorney's fees.

## THE HAGUE CONVENTION

■ The Hague Convention on Civil Aspects of International Child Abduction (the

---

1. Between October 2001 and August 2004, J.J.L.-P. visited Jurado–Galaz regularly in Mexico, staying with his father for several months at a time.

2. The Central Authority is an arm of government in nations that are signatories to the Hague Convention that will provide assistance to parents seeking the return of their children from other signatory countries. *See* 42 U.S.C. § 11602(1); *Velez v. Mitsak*, 89 S.W.3d 73, 80 (Tex.App.-El Paso 2002, no pet.).

3. The trial court did not enter its order on the issue of attorney's fees until January 2007 because the Cruzes removed the underlying case to federal court in an effort to halt J.J.L.-P.'s return to Mexico. The federal district court denied the Cruzes' petition as moot and remanded the case to state court on September 18, 2006.

"Hague Convention"), to which both the United States and Mexico are signatories, "attempts to 'protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the state of their habitual residence, as well as to secure protection for rights of access.'" *Flores v. Contreras*, 981 S.W.2d 246, 248 (Tex.App.-San Antonio 1998, pet. denied); *see* The Hague Convention on the Civil Aspects of International Child Abduction, *opened for signature* Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501, 1343 U.N.T.S. 89, *reprinted in* 51 Fed.Reg. 10,494 (1986). The Hague Convention's procedures "are not designed to settle international custody disputes, but rather to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases." *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3rd Cir.2006); *see also Silverman v. Silverman*, 267 F.3d 788, 791–92 (8th Cir. 2001) (citing *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir.1995)) (stating the Hague Convention is intended "'to restore the status quo ante and to deter parents from crossing international boundaries in search of a more sympathetic court.'"). Congress implemented the Hague Convention by enacting the International Child Abduction and Remedies Act ("ICARA"), *see* 42 U.S.C. §§ 11601 *et seq.*, which confers concurrent jurisdiction to state and federal courts to determine the merits of an abduction claim under the Hague Convention, but not the merits of the underlying custody dispute. *Id.* § 11603(a); *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000).

■ Pursuant to ICARA, the Hague Convention petitioner bears the initial burden of establishing by a preponderance of the evidence that his or her child "has

been wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A); *Velez v. Mitsak*, 89 S.W.3d 73, 80 (Tex.App.-El Paso 2002, no pet.). A removal or retention is considered "wrongful" when "it is in breach of rights of custody attributed to a person ..., either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention," and "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Hague Convention, art. 3; *see also In re Vernor*, 94 S.W.3d 201, 208 (Tex.App.-Austin 2002, orig. proceeding). Once a petitioner establishes that a wrongful removal or retention has occurred, the child must be repatriated unless the respondent establishes that any of the Hague Convention's affirmative defenses apply. *See Lops v. Lops*, 140 F.3d 927, 945 (11th Cir.1998).

■ The affirmative defenses that a respondent may assert under the Hague Convention include: (1) there is a grave risk that the return of the child "would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," Hague Convention, art. 13b; (2) return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms," *Id.* art. 20; (3) the proceedings were not commenced within one year after the child's abduction and the child is now settled in his or her new environment, *Id.* art. 12; and (4) the petitioner was not actually exercising custody rights at the time of the removal or retention or had consented to or subsequently acquiesced in the removal or retention. *Id.* art. 13a. ICARA provides that a respondent must prove the defenses to return set out in

articles 13b and 20 of the Hague Convention by clear and convincing evidence, but need only prove those defenses set out in articles 12 and 13a by a preponderance of the evidence.[4] Even if the respondent proves a defense is available, the return of the child is nevertheless a matter of judicial discretion. *Mitsak*, 89 S.W.3d at 81; *see also England*, 234 F.3d at 271 (recognizing "a federal court has 'and should use when appropriate' the discretion to return a child to his or her place of habitual residence 'if return would further the aims of the Convention.' "). Courts are to construe the defenses to return under the Hague Convention narrowly. *Mitsak*, 89 S.W.3d at 81; *Rydder*, 49 F.3d at 372.

### A. Jurisdiction

The Cruzes argue the trial court lacked jurisdiction to consider Jurado–Galaz's Hague Convention petition because Jurado–Galaz failed to follow the proper filing procedures under ICARA for a Hague Convention petition. The record shows that Jurado–Galaz filed his custody action in the 406th Judicial District Court of Webb County, Texas on January 4, 2006, and filed his Hague Convention petition with the court on July 19, 2006. When Jurado–Galaz filed his Hague Convention petition with the court, the trial court clerk filed the petition under the same cause number as Jurado–Galaz's pending SAPCR suit and not as a separate and distinct lawsuit. The Cruzes contend that,

under ICARA, Jurado–Galaz was required to file his Hague Convention petition as a separate and distinct lawsuit from his SAPCR case to properly invoke the trial court's jurisdiction to determine his rights under the Convention. Thus, the Cruzes contend that by filing his Hague Convention petition as part of an existing SAPCR suit, as opposed to an independent suit, Jurado–Galaz failed to "commence a civil action" for the return of J.J.L.-P. as required by ICARA. *See* 42 U.S.C. § 11603(b).

■ To resolve this issue, we must review the plain language of ICARA to determine whether Congress granted Jurado–Galaz any discretion as to how he was to file his Hague Convention petition. Section 11603(b) provides:

> Any person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child *may* do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.

*Id.* (emphasis added). By using the word "may" as opposed to the word "shall" in section 11603(b), we believe Congress indicated an intent to grant petitioners, like

---

4. 42 U.S.C. § 11603(e)(2); *Mitsak*, 89 S.W.3d at 80–81. Thus, the defenses to return that a respondent must prove by clear and convincing evidence are: (1) there is a grave risk that the return of the child "would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," Hague Convention, art. 13b; and (2) return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."

*Id.* art. 20. By contrast, the defenses to return that a respondent may prove by a preponderance of the evidence are: (1) the proceedings were not commenced within one year after the child's abduction and the child is now settled in his or her new environment, *Id.* art. 12; and (2) the petitioner was not actually exercising custody rights at the time of the removal or retention or had consented to or subsequently acquiesced in the removal or retention. *Id.* art. 13a.

Jurado–Galaz, some discretion over how to pursue their Hague Convention petition. *See generally U.S. v. Rodgers*, 461 U.S. 677, 706, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion."); *Roth v. Dist. of Columbia Courts*, 160 F.Supp.2d 104, 109 (D.D.C. 2001) ("May is most commonly used to indicate that an action is permissive, or in the discretion of the actor.").

It is entirely reasonable for this court to presume Congress intended the word "may" to carry its ordinary meaning within the context of section 11603(b) given the fact that Congress used the word "shall" elsewhere within section 11603. *Compare* 42 U.S.C. § 11603(b) ("Any person seeking to initiate judicial proceedings ... *may* do so by ...") *with id.* at (a) ("The courts of the States and the United States district courts *shall* have concurrent original jurisdiction of actions arising under the Convention"); (c) ("Notice of an action brought under subsection (b) of this section *shall* be given in accordance with the applicable law governing notice in interstate child custody proceedings"); (d) ("The court in which an action is brought under subsection (b) of this section *shall* decide the case in accordance with the Convention"); (e)(1) ("petitioner in an action brought under subsection (b) of this section *shall* establish by a preponderance of the evidence ..."); (g) ("Full faith and credit *shall* be accorded by the courts of the States and the courts of the United States to the judgment of any other such court ordering or denying the return of a child ..."); and (h) ("The remedies established by the Convention and this chapter *shall* be in addition to remedies available under other laws or international agreements") (emphasis added). "[W]hen the same [statutory provision] uses both 'may' and 'shall,' the normal inference is that each is used in its usual sense-the one act being permissive,

the other mandatory." *Anderson v. Yungkau*, 329 U.S. 482, 485, 67 S.Ct. 428, 91 L.Ed. 436 (1947). Furthermore, " '[i]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.' " *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (citation omitted). Because Congress did not include the word "shall" within section 11603(b), as it did elsewhere within the statute, Jurado–Galaz had the discretion to file his petition, as he did, as a pleading in his existing custody suit or as a separate and distinct lawsuit from his custody action as provided for under section 11603(b). The Cruzes' jurisdictional complaint is therefore overruled.

### B. Waiver

■ The Cruzes also contend Jurado–Galaz waived his rights under the Hague Convention by filing for custody in the jurisdiction where J.J.L.-P. was removed. They direct us to *Journe v. Journe*, 911 F.Supp. 43, 47–48 (D.P.R.1995), in which the United States District Court for the District of Puerto Rico concluded a petitioner waived his rights under the Hague Convention. However, we do not believe Jurado–Galaz waived his rights under the Hague Convention.

In *Journe*, Bruno George Joseph Journe ("Journe") filed for divorce and custody in France, the country where he and his family resided. 911 F.Supp. at 45. Journe's wife, Liselie Soto Ramos ("Ramos"), then left France with the children destined for Puerto Rico. *Id.* After Ramos was there, Journe requested the dismissal of his divorce and custody proceedings because he believed that he and Ramos had reconciled following a hearing in their case. *Id.* The French court granted Journe's request and dismissed the proceedings. *Id.* Ramos,

however, never returned to France and claimed that no reconciliation had occurred. *Id.*

Journe sought to exercise his rights under the Hague Convention in the federal district court in Puerto Rico and have his children returned to France. *Id.* at 44–45. The district court held that Journe's voluntary dismissal of the divorce complaint constituted a waiver of his rights under the Hague Convention. *Id.* at 48. The court recognized that Journe had been afforded an opportunity to be before a French forum to resolve the custody issues under French law as contemplated by the Hague Convention. *Id.* The court explained: "Given these circumstances, [Journe's] voluntary dismissal of the action for divorce can only be characterized as indicative of an intent to relinquish his rights to have the custody issues decided by the courts of France. No other reasonable explanation of [Journe's] conduct is possible."[5] The *Journe* court noted in its analysis that "a valid waiver of a legal right requires both knowledge of its existence and an uncoerced intent to relinquish it." *Id.* at 47–48. The court also stated that "if proof of waiver rests upon one's acts, these acts should be so manifestly consistent with and indicative of an intent to relinquish voluntarily a particular right that no other reasonable explanation of this conduct is possible." *Id.* at 48.

Here, unlike *Journe,* the record does not demonstrate Jurado–Galaz knowingly and intentionally waived his rights under the Hague Convention. The record shows that Jurado–Galaz came to the United States in January 2006 to look for J.J.L.-P. after he learned Susana intended to retain J.J.L.-P. After he could not locate J.J.L.-P., Jurado–Galaz obtained legal counsel to secure the return of J.J.L.-P. Jurado–Ga-

laz's counsel, who, like Jurado–Galaz, was unaware of the Hague Convention, sought to secure J.J.L.-P.'s return via a custody action filed with the trial court on January 4, 2006. Jurado–Galaz subsequently returned to Mexico and learned of his rights under the Hague Convention from the Central Authority in Jalisco, Mexico. Jurado–Galaz then, on July 19, 2006, had his attorney file a Hague Convention petition with the trial court seeking the return of J.J.L.-P. to Mexico and had counsel secure an order staying all further proceedings in his custody action. Given the fact that Jurado–Galaz did not learn of his rights under the Hague Convention until after he had filed the custody action, we decline to adopt the Cruzes' waiver rational because a valid waiver of one's Hague Convention rights cannot occur without knowledge of the mandates of the Convention. *See id.* at 47–48 (recognizing "a valid waiver of a legal right requires both knowledge of its existence and an uncoerced intent to relinquish it."). Accordingly, we overrule the Cruzes' waiver complaint.

### C. Wrongful Removal or Retention

The Cruzes claim the trial court erred by ordering the return of J.J.L.-P. to Mexico under the Hague Convention because Jurado–Galaz failed to establish that they wrongfully retained J.J.L.-P. According to the Cruzes, Jurado–Galaz failed to demonstrate they retained J.J.L.-P. from his habitual residence or that he had rights of custody at the time of J.J.L.-P.'s retention as required by the Hague Convention. *See* Hague Convention, art. 3; *Vernor,* 94 S.W.3d at 208. We disagree.

The first issue we must address is whether Jurado–Galaz demonstrated by a preponderance of the evidence

---

**5.** *Id.* The court was not persuaded by Journe's purported reason for requesting the voluntary dismissal of his divorce petition, namely that a reconciliation had occurred. *Id.* at n. 4.

that J.J.L.-P. was habitually resident in Mexico prior to his retention. While the Hague Convention does not itself define what it means to be "habitually resident," courts have concluded that the term refers to a child's customary residence prior to his or her removal or retention. *See Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001) (citing cases). The habitual residence inquiry proceeds on a case-by-case basis, and it focuses not upon a child's domicile or legal residence but where the child physically lived "for an amount of time sufficient for acclimitization and which has a 'degree of settled purpose' from the child's perspective." *Flores*, 981 S.W.2d at 249; *see Feder v. Evans–Feder*, 63 F.3d 217, 224 (3rd Cir.1995). The determination of whether any particular place satisfies this standard focuses "on the child, not the parents, and examine[s] past experience, not future intentions." *Flores*, 981 S.W.2d at 249. Furthermore, "[f]uture intentions harbored by one parent are irrelevant to the court's inquiry." *Id.*

The habitual residence determination "presents a classic mixed question of law and fact." *Id.* When a matter involving both factual determinations and legal conclusions is decided by the trial court, we generally employ an abuse of discretion standard. *Id.* "By applying the abuse of discretion standard, the reviewing court defers to the trial court's factual determinations while properly fulfilling its role to determine questions of law de novo." *Id.*

It is essentially undisputed that Laredo, Texas was J.J.L.-P.'s habitual residence from November 2000 through August 2004. However, the parties dispute whether J.J.L.-P.'s habitual residence changed from Laredo, Texas to Guadalajara, Mexico on or about August 2004 when the parties agreed that J.J.L.-P. would live with Jurado–Galaz. The record

indicates the trial court heard testimony from both Susana and Jurado–Galaz regarding J.J.L.-P.'s habitual residence. The trial court heard Susana testify that on or about April 2004 she began living with David. Susana, who was not a legal resident at the time she began her relationship with David, testified David was employed as a United States Border Patrol agent when they met, and that due to the nature of David's employment with the U.S. Border Patrol she had concerns about having J.J.L.-P. living with her. According to Susana, bringing J.J.L.-P. to live with her and David without legal immigration status "would have affected [J.J.L.-P.], and that is not good" and the best thing for J.J.L.-P. was to return to Mexico to live with Jurado–Galaz. Susana further stated that she wanted J.J.L.-P. to have both "legal" and "emotional" stability so she agreed for J.J.L.-P. to move to Mexico. Susana testified she became a legal resident of the United States in March 2005. After becoming a legal resident, Susana testified she desired to have J.J.L.-P. return to the United States because "the best thing for [J.J.L.-P.] was for him to be ... with his mother."

Jurado–Galaz likewise testified that he and Susana reached an agreement in August 2004 for J.J.L.-P. to live with him in Mexico because it was the best situation for J.J.L.-P. He testified that after they had reached the agreement for J.J.L.-P. to return to Mexico, Susana gave him J.J.L.-P.'s inoculation documents and birth certificate. Jurado–Galaz indicated that J.J.L.-P. was enrolled in school in Guadalajara at the time of his retention, engaged in regular after school activities, visited family and friends living in Guadalajara, and visited parks, zoos, beaches, mountains, and other destinations each weekend with him. He stated Susana never notified him of her plan to retain J.J.L.-P. before December 28, 2005. Jurado–Galaz testified he imme-

diately came to Texas to find J.J.L.-P. upon learning of Susana's intent to retain the child. Jurado–Galaz indicated that he was unable to locate Susana when he came to Texas because Susana had relocated and refused to reveal her whereabouts to him.

The record also shows that sometime after the parties testified, Susana filed an affidavit with the trial court. Susana's affidavit basically reiterated that she and Jurado–Galaz had an agreement for J.J.L.-P. to move to Mexico in August 2004. Unlike her earlier testimony, however, Susana's affidavit provided that J.J.L.-P. "lived in Guadalajara, Mexico from August of 2004 through December of 2005, only for the purpose of obtaining his immigration documents."

The record shows that following the parties' August 2004 agreement, J.J.L.-P. moved to Guadalajara, Mexico, where he lived for approximately 16 months until his retention by Susana. During his time in Mexico, J.J.L.-P. engaged in the usual day-to-day activities of a child his age and established substantial ties between himself and Mexico. Not only was J.J.L.-P. attending school in Guadalajara, he participated in after school activities there, had regular contact with family and friends who lived nearby, and became familiar with the culture and geography of the town and country in which he lived through his weekend travels with his fa-

ther. In light of this evidence, we hold the trial court properly concluded J.J.L.-P. habitually resided in Mexico prior to his retention by the Cruzes.

■ Susana maintains on appeal that it was never her intention to change J.J.L.-P.'s habitual residence from the United States to Mexico when she agreed for J.J.L.-P. to live with Jurado–Galaz. She argues the record shows J.J.L.-P.'s return to Mexico was temporary and "only for the purpose of obtaining [J.J.L.-P.'s] immigration documents." As this court has recognized, the habitual residence inquiry focuses on the child—not the parents. *See Flores,* 981 S.W.2d at 249. Because Susana's argument focuses upon her own intentions rather than J.J.L.-P.'s past experiences, we reject Susana's contentions on appeal.[6]

■ Having established that Mexico is J.J.L.-P.'s country of habitual residence, we must now examine whether the Cruzes' retention of J.J.L.-P. breached Jurado–Galaz's rights of custody under Mexican law.[7] The Cruzes contend that, under the Civil Code for the State of Jalisco, Mexico, Jurado–Galaz possessed no rights of custody at the time of J.J.L.-P.'s retention because the Jalisco Civil Code grants the privilege of custody to the child's mother when the child's parents are separated. Jurado–Galaz disputes the Cruzes' contention, claiming that, while the Jalisco Civil Code does grant a privilege of custody to a child's

**6.** Nevertheless, even if Susana's intent is relevant to our determination, we would still not disturb the trial court's habitual residence finding. The trial court was apparently not persuaded by Susana's statement that J.J.L.-P.'s move to Mexico was for the purpose of acquiring his immigration documents given that it heard the parties testify that the move was to provide J.J.L.-P. with legal and emotional stability. It was within the province of the trial court to determine the true reason for J.J.L.-P.'s return to Mexico—a factual de-

termination that we must afford deference to on appeal.

**7.** *See Hanley v. Roy,* 485 F.3d 641, 645 (11th Cir.2007) ("[t]he existence of 'rights of custody' are determined by the law of the country in which the child habitually resides at the time of removal"). The record in this case includes affidavits from two attorneys from Mexico who offer explanations and translations of the relevant statutory provisions from the Civil Code for the State of Jalisco, Mexico.

mother when the child's parents are separated, he nonetheless possessed rights of custody in this instance because the parties mutually agreed that Jurado–Galaz would assume the care of J.J.L.-P. upon the child coming to live with him in Mexico.

The Hague Convention states that rights of custody "shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5a. While the Hague Convention itself provides no further definition of the term "rights of custody,"[8] courts have commonly looked to the background report of the Hague Convention containing the official history and commentary of the Convention for further guidance. This "report states that 'the law of the child's habitual residence is invoked in the widest possible sense,' and that the sources from which custody rights derive are 'all those upon which a claim can be based within the context of the legal system concerned.' " *Whallon v. Lynn*, 230 F.3d 450, 455 (1st Cir.2000). The report also indicates that " 'the intention [of the Convention] is to protect all the ways in which custody of children can be exercised,' and the Convention favors 'a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration.' " *Furnes v. Reeves*, 362 F.3d 702, 716 n. 12 (11th Cir. 2004).

 Courts have recognized that the violation of a single right of custody suffices to make the removal or retention of a child wrongful. *See Hanley v. Roy*, 485 F.3d 641, 647 (11th Cir.2007). " 'That is, a parent need not have 'custody' of the child to be entitled to return of his child under the Convention; rather, he need only have one right of custody,' " *id.* (citation omitted), which may arise by operation of law, by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of the child's habitual residence. *See* Hague Convention, art.3.

 We take judicial notice that if the parents of a child are separated and cannot reach an agreement as to custody of the child, the Jalisco Civil Code provides that the child's mother has the privilege of custody over the minor child—not the father. *See Codigo Civil del Estado de Jalisco*, art. 572; 585. In this case, however, this presumption does not appear to apply. The record shows that the parties mutually entered into an agreement in August 2004 for J.J.L.-P. to move to Guadalajara, Mexico to live with Jurado–Galaz and remain in Jurado–Galaz's care for an indeterminate period. The parties thus agreed that Jurado–Galaz would assume the responsibility of caring for J.J.L.-P. on a daily basis, including providing the child with food, shelter, education, clothing, and affection. By entering into such agreement, Susana effectively acquiesced in Jurado–Galaz assuming "voluntary custody" of J.J.L.-P. under Mexican law. *See id.* art. 565 (stating "voluntary custody" arises from a free agreement between the parties). We therefore conclude Jurado–Galaz had rights of custody under Mexican law at the time of J.J.L.-P.'s retention, and hold the Cruzes breached those rights when they retained J.J.L.-P. in Texas.

## D. Affirmative Defenses

The Cruzes argue the trial court erred by ordering the return of J.J.L.-P. to Mex-

---

**8.** The Hague Convention, however, does contrast "rights of custody" with the far more limited "rights of access," which include "the right to take a child for a limited period of time to a place other than the child's habitual residence." Hague Convention, art. 5b.

ico because Jurado–Galaz consented to their retention of the child when he surrendered the child's travel documents to them in December 2005. Article 13(a) of the Hague Convention establishes that a court need not order the return of a child if the petitioner "had consented to or subsequently acquiesced in the removal or retention." Hague Convention, art. 13a. Although analytically distinct, the defenses of consent and acquiescence under article 13(a) of the Hague Convention are both narrow. *See* 42 U.S.C. § 11601(a)(4). "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Baxter v. Baxter*, 423 F.3d 363, 371 (3rd Cir.2005); *see Gonzalez–Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir.2001).

"The key to the consent inquiry is the petitioner's subjective intent, including the nature and scope of the alleged consent." *In re Kim*, 404 F.Supp.2d 495, 516 (S.D.N.Y.2005); *see Baxter*, 423 F.3d at 371. Thus, the appropriate formulation for the consent defense is that the respondent must prove by a preponderance of the evidence that the petitioner harbored a subjective intent to permit the respondent to remove or retain the child for an indefinite or permanent time period. *Kim*, 404 F.Supp.2d at 516. The parties' conduct following the removal or retention of the child is also relevant to the issue of consent. *Gonzalez–Caballero*, 251 F.3d at 794.

Although the trial court heard Susana testify that she made Jurado–Galaz aware of her intent to retain J.J.L.-P. sometime before she arrived for J.J.L.-P. in December 2005, the court heard testimony to the contrary from Jurado–Galaz. Jurado–Galaz testified Susana did not tell him of her plan to retain J.J.L.-P. until December 28, 2005. Jurado–Galaz testified that he gave Susana J.J.L.-P.'s visa and temporary travel permit to allow J.J.L.-P. to enter the United States with Susana for the holidays. Jurado–Galaz further testified he promptly came to Texas to look for J.J.L.-P. once he learned of Susana's plan to retain the child. He stated he took immediate legal action to secure J.J.L.-P.'s return when Susana would not reveal the child's whereabouts to him.

The trial court apparently determined Jurado–Galaz's testimony was both credible and consistent, unlike the testimony provided by Susana, and we must defer to these factual determinations on appeal. Giving deference to the trial court's factual determinations, the record simply does not support the Cruzes' claim that Jurado–Galaz consented to their retention of J.J.L.-P. The record shows Jurado–Galaz agreed to let J.J.L.-P. go with the Cruzes to Texas for only a limited period of time—the Christmas holiday. It also shows Jurado–Galaz provided Susana with the types of travel documents one would ordinarily need for a brief visit to the United States and nothing more. The record further indicates Susana concealed J.J.L.-P.'s whereabouts from Jurado–Galaz and avoided meeting Jurado–Galaz after she retained J.J.L.-P., actions which would be unnecessary if she truly believed Jurado–Galaz had consented to her retention of the child. Finally, the record demonstrates Jurado–Galaz took prompt action to bring about the swift and indefinite return of his son to Mexico after he learned of J.J.L.-P.'s retention. Because the record contains evidence demonstrating Jurado–Galaz never subjectively intended to consent to his son's retention in the United States, we conclude the trial court did not err in finding that the Cruzes failed to meet their burden on their consent defense.

The Cruzes argue this case is similar to *Gonzalez–Caballero v. Mena*, where the Court of Appeals for the Ninth Circuit upheld a finding of consent under the Hague Convention and denied a petition for return. *See* 251 F.3d at 794. However, we are not convinced there is a similar factual basis for finding consent in the case at bar. In *Gonzalez–Caballero*, the record included evidence that the child's parents had concluded the child "would have a better life in the United States" and should immigrate to be with respondent, an American citizen. *Id.* at 791. The evidence showed the petitioner had told the respondent that she could no longer care for the child because she was pregnant and her boyfriend had left her. *Id.* There was also evidence indicating the petitioner provided the respondent with all of the child's personal documentation, not just the paperwork necessary for a brief visit to the United States. *Id.* at 791, 793. Further, the evidence indicated that the petitioner petitioned for the child's return only after "regretting her decision" to allow her daughter to be removed to the United States. *Id.* at 793. *Gonzalez–Caballero* is factually distinguishable and is therefore not persuasive.

### D. Attorney's Fees

Finally, the Cruzes claim the trial court's award of attorney's fees to Jurado–Galaz requires reversal because the court cited an improper legal basis as support for its award. As a conclusion of law, the trial court determined "that attorney's fees and expenses are reasonable and necessary and should be paid by [the Cruzes] as per UCCJEA, Texas [Family] Code [§ ] 152.312(a)." The Cruzes contend the trial court's reliance on section 152.312(a) of the Texas Family Code is misplaced because this provision of the Family Code does not justify an award of attorney's fees until a final custody determination has been made

by the trial court; a determination the court was prohibited from making under ICARA. *See England*, 234 F.3d at 271.

We review the trial court's conclusions of law de novo. *McLaughlin, Inc. v. Northstar Drilling Technologies, Inc.*, 138 S.W.3d 24, 27 (Tex.App.-San Antonio 2004, no pet.). "A conclusion of law will be reversed if it is erroneous as a matter of law." *Benedictine Sisters of the Good Shepherd v. Ellison*, 956 S.W.2d 629, 631 (Tex.App.-San Antonio 1997, pet. denied). Erroneous conclusions of law need not prompt a reversal, however, "if the judgment can be sustained on any legal theory supported by the evidence." *Swate v. Medina Cmty. Hosp.*, 966 S.W.2d 693, 697 (Tex.App.-San Antonio 1998, pet. denied).

■ Even if section 152.312(a) is not a valid legal basis to support an award of attorney's fees under the circumstances presented, we must nevertheless decline to disturb the trial court's award of attorney's fees. The Cruzes ignore that the trial court's findings of fact and conclusions of law provide a valid alternate legal basis for the award of attorney's fees to Jurado–Galaz. As an alternate conclusion of law, the trial court stated "attorney's fees and expenses are reasonable and necessary and should be paid by [the Cruzes] as per USC Title 42[§ ] 11607(b)(3)." Section 11607(b)(3) mandates that courts award successful Hague Convention petitioners their necessary attorney's fees. *See* 42 U.S.C. § 11607(b)(3) ("Any court ordering the return of a child pursuant to an action brought under section 11603 of this title *shall* order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent

establishes that such order would be clearly inappropriate."). Because Jurado–Galaz is a successful petitioner, the trial court was required to award Jurado–Galaz his necessary attorney's fees under ICARA. The Cruzes' challenge to the trial court's award of attorney's fees is therefore overruled.

CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed.