**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 10-1678 & 10-1825

MARINA KARPENKO,

Appellee/Cross-Appellant

v.

PAUL LEENDERTZ,

Appellant/Cross-Appellee

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5-09-cv-03207)
District Judge: Honorable Thomas M. Golden

Argued July 12, 2010

Before:  FUENTES, ALDISERT, and ROTH, Circuit Judges.

(Opinion filed: August 24, 2010)

Stephen J. Cullen, Esquire **(Argued)**
Kelly A. Powers, Esquire
Joshua J. Gayfield, Esquire
Miles & Stockbridge, P. C.
10 Light Street
Baltimore, MD   21202

Counsel for Appellee/Cross-Appellant

Linda Shay Gardner, Esquire **(Argued)**
Gardner Law Offices
740 Main Street
Bethlehem, PA   18018

Counsel for Appellant/Cross Appellee

———————

O P I N I O N

———————

**ROTH**, Circuit Judge:

Paul Leendertz, father of the minor child at issue in this proceeding, appeals the District Court's grant of a petition filed by the mother, Marina Karpenko, for the child's return under the Hague Convention on the Civil Aspects of International Child Abduction.  For the following reasons, we will affirm the grant of Karpenko's petition and order the minor child's immediate return to her mother in the Netherlands.

## I. Background

This action follows a long, bitter dispute between Leendertz and Karpenko over custody of their minor child, E.L., born in Pennsylvania in 2001.  Leendertz and Karpenko were married at the time of E.L.'s birth, but separated in 2002 and officially divorced in 2007.  In September 2002, the Pennsylvania Court of Common Pleas issued an order incorporating a Custody Stipulation executed by the parties which provided that (1) Karpenko would obtain primary physical custody and live with E.L. in the Ukraine, Karpenko's native country; and (2) Leendertz would have regular visitation rights to be arranged in the Ukraine, the Netherlands, or the United States.  Leendertz has family in the Netherlands and, as a commercial pilot, is able to visit the Netherlands.

Karpenko initially moved with E.L. to the Ukraine, but at Leendertz's request, she relocated to Ede, Netherlands. E.L. arrived in the Netherlands at age two and began attending Dutch public school at age four. E.L. has numerous Dutch friends and socializes with Karpenko's relatives in the Netherlands. E.L. learned Dutch as her primary language and became immersed in Dutch culture.

Although Karpenko's relocation from the Ukraine to the Netherlands was ostensibly to accommodate Leendertz, Karpenko refused to allow full visitation in accordance with the court-ordered Custody Stipulation. In 2007, following further deterioration of relations, Karpenko moved to a new location in Ede, Netherlands, and refused to provide Leendertz with her address or phone number. In 2008, both parties filed petitions for sole physical and legal custody: she in the Dutch District Court of Arnhem, he in the Pennsylvania Court of Common Pleas. The Dutch court stayed Karpenko's petition pending a decision by the Pennsylvania court.

By Order of May 20, 2009, the Pennsylvania Court of Common Pleas granted sole custody of E.L. to Leendertz. That order purports to (1) transfer sole legal and primary physical custody to Leendertz; (2) grant Leendertz "sole authority to apply for and obtain a United States passport for the minor child without Mother's consent or authorization and without any further notice to Mother;" (3) grant Leendertz authority to "obtain custody of the child at any place that she may be found, whether in the United States or any other country" without any further proceedings; (4) grant Leendertz and his sister authority "to pick up the child at her school or any location;" (5) award Karpenko visitation rights "as she and the Father may agree;" and (6) adjudge Karpenko in civil contempt for willfully violating prior court orders. Karpenko appealed and the Pennsylvania Superior Court affirmed.

3

In the Netherlands, a foreign order is not enforceable until domesticated by a Dutch court. Dutch Civil Code, Title 9, Article 985, *et seq*. However, rather than reducing the May 20, 2009, Order to a domestic judgment under Dutch law, Leendertz arranged to seize E.L. in the Netherlands and return with her to Pennsylvania without notice to Karpenko or the Dutch court presiding over the custody proceeding there. On May 27, 2009, Leendertz located E.L. on the sidewalk outside her school in the Netherlands. With the help of an unidentified third party, Leendertz placed E.L. in a car and drove her to Germany, where they flew to Dubai and ultimately the United States. Dutch authorities issued an Amber Alert within minutes of E.L.'s removal. By Order of May 29, 2009, a Dutch court ruled that (1) at the time of E.L.'s removal, Karpenko and Leendertz had joint custody under Dutch law; (2) Leendertz acted unlawfully by removing the child without Karpenko's permission; and (3) Leendertz shall immediately return E.L. to Karpenko. Leendertz refused to comply with the Dutch Order and currently resides with his new wife and E.L. in Northampton, Pennsylvania.

On July 20, 2009, Karpenko filed the instant petition for return of E.L. under the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980, T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10, 494 (1986) (Hague Convention), as codified by the International Child Abduction Remedies Act, 42 U.S.C. 11601, *et seq*. (ICARA). Karpenko claims she is entitled to the immediate return of her daughter because Leendertz wrongfully removed her from the Netherlands to the United States.

The District Court for the Eastern District of Pennsylvania granted Karpenko's petition for E.L.'s return on March 3, 2010. To avoid potentially relocating E.L. multiple times during the pendency of this proceeding, however, the

District Court stayed enforcement of its Order pending appeal. Leendertz appeals the District Court's grant of Karpenko's Hague Convention petition. Karpenko cross-appeals the District Court's entry of the stay.

## II. **Jurisdiction and Standard of Review**

The District Court properly exercised jurisdiction under 42 U.S.C. § 11603(a), which confers United States district courts with original jurisdiction over actions arising under the Convention.[1] We have jurisdiction under 28 U.S.C. § 1291.

We review the District Court's factual findings for clear error. Factual findings will be upheld so long as the District Court's "account of the evidence is plausible in light of the record, even if . . . we would have weighed the evidence differently." *Yang v. Tsui*, 499 F.3d 259, 270 (3d Cir. 2007). Conclusions of law are reviewed *de novo*. *Id.*

---

[1]The District Court properly rejected Leendertz's arguments for abstention under *Younger v. Harris*, 401 U.S. 37 (1971), and *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), because these matters, raised in this federal court action, were never raised in the Pennsylvania state court custody proceeding. *See Yang v. Tsui*, 416 F.3d 199, 202 (3d Cir. 2005). By its own terms, a proceeding under the Hague Convention is distinct from determinations of custody, Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."), so the pendency of custody proceedings in state court supplies no reason for a federal court to abstain from adjudicating a Hague Convention petition.

### III. Discussion

The Hague Convention, Article 1, sets forth its two primary objectives: "(a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and (b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." The Hague Convention does not provide a forum to resolve international custody disputes, but rather it provides a legal process "to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases." *Yang*, 499 F.3d at 270. The United States and the Netherlands are State signatories to the Convention.

Under the Hague Convention, the petitioner bears the initial burden of proving by preponderance of the evidence that the child was habitually resident in a State signatory to the Convention and was wrongfully removed to a different State as defined by Article 3.[2] *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006). "[A] child's habitual residence is the place

---

[2]Article 3 of the Convention provides:

The removal or the retention of a child is to be considered wrongful where --

> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

6

where he or she has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." *Id.* at 291-92. In *Yang*, we divided the analysis of the petitioner's burden into four parts:

> A court must determine (1) when the removal or retention took place; (2) the child's habitual residence immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention.

499 F.3d at 270-71. Once the petitioner meets its initial burden, the respondent may oppose the child's return by proving one of five affirmative defenses.[3]

---

[3]The affirmative defenses require the respondent to prove (1)that a grave risk that the child's return would expose him or her to physical or psychological harm or otherwise place the child in an intolerable situation by clear and convincing evidence; (2) that the child's return would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms by clear and convincing evidence; (3) that the child is now settled in his or her new environment by preponderance of the evidence; (4) that the person from whom the child was removed was not exercising custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention by preponderance of the evidence; or (5) that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views by preponderance of the evidence. 42 U.S.C. § 11603(e)(2).

7

The District Court held an evidentiary hearing, after which it issued the following factual findings and legal conclusions: E.L. was removed on May 27, 2009, from her habitual residence in the Netherlands.[4] Karpenko had custody at the time of removal because, under Dutch law, divorced parents retain joint custody until a Dutch court rules otherwise; there was no severance of joint custody by a Dutch court as of May 27, 2009, a point conceded by Leendertz's expert on Dutch law. Karpenko was exercising her custody rights at the time of removal because she was actively involved in E.L.'s daily life. By removing E.L., Leendertz breached Karpenko's custody rights under Dutch law because he resorted to an extreme form of self-help, "a snatch and run," rather than registering the Pennsylvania court's May 20, 2009, Order in the Netherlands as required by Dutch law. Leendertz failed to carry his burden of establishing his affirmative defense, *i.e.*, that granting the petition would pose a grave risk of physical, sexual, or psychological abuse upon E.L.'s return.

Leendertz argues that the District Court's factual findings are clearly erroneous. We disagree. Leendertz's claims of error do not leave us with a firm conviction that any of the factual

[4]The District Court explained its holding on habitual residence as follows:

The child moved with the Mother to the Netherlands when she was only two years old. The child has lived in the Netherlands with the Mother for the past six years. At the time she was removed, the child was attending school in the Netherlands where she has numerous friends. Her primary language is Dutch and she was fully involved in all aspects of daily and cultural life in the Netherlands. There can be no doubt that the Netherlands, not the United States, is the place where she has been physically present from the age of two until she was removed at the age of eight and which held a degree of settled purpose from the child's perspective.

findings are mistaken. For example, Leendertz argues that the District Court failed to consider the parties' settled parental intent regarding the child's location in its analysis of habitual residence. As "critical" evidence of settled parental intent that E.L. would reside in the United States, Leendertz relies on a February 28, 2002, custody agreement which purports to stipulate E.L.'s habitual residence to be the United States. Even assuming it were possible for parents to contractually stipulate a child's habitual residence, Leendertz's reliance on the February 28, 2002, agreement is misplaced. That stipulation was vacated when the Pennsylvania court adopted the parties' subsequently executed Custody Stipulation on September 19, 2002. The September 19, 2002, Custody Stipulation states that E.L. would reside in the Ukraine.

In another claim of purported error, Leendertz argues the District Court disregarded evidence that his conduct complied with Dutch and American law "[a]t all times," and therefore he did not breach Karpenko's custody rights by removing E.L. from the Netherlands. Leendertz contends he was legally entitled to rely on the Pennsylvania court's May 20, 2009, Order when he seized E.L. outside her school in the Netherlands. However, that Order purports to exercise power authorizing conduct by Leendertz on foreign soil – in particular, a "snatch and grab," as accurately characterized by the District Court. A Pennsylvania state court lacks jurisdiction to authorize such conduct; therefore, the Pennsylvania court's May 20, 2009, Order was a nullity in the Netherlands until domesticated by a Dutch court. On May 29, 2009, a Dutch court ruled that Leendertz acted unlawfully by removing the child without Karpenko's permission. These facts support the District Court's finding that Leendertz breached Karpenko's custody rights.

We conclude that the District Court's findings of fact were not clearly erroneous. We agree with the District Court's ultimate assessment: "Under no authority was the Father

9

authorized to snatch the child from her school in the manner he did."

At oral argument, a member of this panel posed a novel question which was not raised or briefed by the parties or considered by the District Court: Should this Court exercise its equitable power to deny relief under the Hague Convention because Karpenko filed this petition with unclean hands? The doctrine of unclean hands, named for the equitable maxim that "he who comes into equity must come with clean hands," "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). The doctrine may be raised *sua sponte*, *Highmark, Inc. v. UPMC Health Plan*, 276 F.3d 160, 174 (3d Cir. 2001); the question then is whether its application is appropriate here.

Karpenko's conduct in the Netherlands was decidedly not commendable; it was wrong for her to interfere with Leendertz's visitation rights and to refuse to disclose the child's new address after relocating. But we are not aware of any authority that would support dismissal of a Hague Convention petition on grounds of unclean hands.[5] The language of the Hague Convention, and of ICARA which implements it, demonstrates that their purpose is to protect the well-being of children. The Convention's preamble emphasizes that "the interests of

---

[5]Our sister court has exercised inherent equitable power to deny relief in the analogous but distinct context of fugitive disentitlement, which "limits access to courts in the United States by a fugitive who has fled a criminal conviction in a court in the United States," *Prevot v. Prevot*, 59 F.3d 556, 562 (6th Cir. 1995) (Hague Convention petition dismissed because petitioner was a fugitive in the United States), but fugitive disentitlement does not apply to Karpenko's conduct here.

children are of paramount importance in matters relating to their custody" and expresses a desire to protect children from the harms caused by wrongful removal. Hague Convention, preamble. The conduct of the parents, other than the claim of abduction or retention, is not mentioned in the Hague Convention except to the extent that that conduct may be relevant to one of the affirmative defenses. Moreover, article 19 of the Convention provides that a decision to return a child under the Convention is not a determination on the merits of custody. Custody is to be decided by a court of the child's "habitual residence." The purpose of the Convention is to safeguard the child by discouraging kidnapping in connection with custody disputes.

We conclude that application of the unclean hands doctrine would undermine the Hague Convention's goal of protecting the well-being of the child, of restoring the status quo before the child's abduction, and of ensuring "that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1(b).

Furthermore, wrongful removal of a child is most likely to occur when strained relations between parents are at their worst. As part of the irresponsible behavior that may accompany such strained relations, one or both parents may interfere with the other's custody rights. The Hague Convention discourages parents from resorting to the most extreme form of interference, child abduction, by providing a judicial remedy for removal. If relief for abduction were unavailable to parents with allegedly unclean hands, the well-being of the abducted child, which is a main purpose of the Hague Convention, would be ignored. There would be no remedy to prevent a cycle of abduction and re-abduction, an outcome which would inflict needless harm on vulnerable children.

11

As we have mentioned, a petitioner's prior conduct may be relevant to determining whether relief should be granted, but such conduct does not destroy eligibility to file a claim under the Hague Convention. Once a petition is filed, the court will consider the petitioner's prior conduct in the context of the respondent's affirmative defenses, such as an assertion that returning the child would pose a grave risk of harm. The affirmative defenses allow consideration of those aspects of the petitioner's conduct which directly relate to the child's well-being. Here, Leendertz did raise the affirmative defense of physical or psychological harm to the child. The District Court found for Karpenko on this issue. In addition, any irresponsible conduct by either party will be a consideration by the proper court in future custody proceedings.

Moreover, when considered against the facts of this case, we can see how inappropriate the doctrine of unclean hands would be because Leendertz engaged in precisely the type of conduct that the Hague Convention was designed to deter. Leendertz brazenly violated Dutch law when he snatched his daughter from school and ran with her from Germany to Dubai to the United States. Dutch authorities responded by issuing an Amber Alert, much the way American authorities would respond if such illegal conduct were to be committed in the United States.

If Leendertz had simply followed the procedures under Dutch law to domesticate the Pennsylvania court's May 20, 2009, Order, the Dutch court would have had the opportunity to consider this claim of custody. In 2008, when the parties filed separate custody petitions in the United States and the Netherlands, the Dutch court stayed Karpenko's custody proceeding pending a ruling by the Pennsylvania court rather than granting Karpenko custody in Leendertz's absence. The Dutch court's handling of the case demonstrates its willingness to consider Leendertz's interests and the Pennsylvania court's

decision. By resorting to self-help, Leendertz foreclosed an opportunity to perfect a claim to custody. We conclude that the doctrine of unclean hands does not bar Karpenko's pursuit of statutory remedies under the Hague Convention to restore the status quo before E.L's abduction.

## IV. Conclusion

For the above stated reasons, we will affirm the District Court's Order, granting Karpenko's petition under the Hague Convention, lift the stay of enforcement of that Order so that E.L. may be returned to the Netherlands immediately, and dismiss Karpenko's cross-appeal of the stay as moot.

Marina Karpenko v. Paul Leendertz
Nos. 10-1678 & 10-1825

---

ALDISERT, Circuit Judge, dissenting.

My colleagues conclude that the Hague Convention and the International Child Abduction Remedies Act (ICARA), 42 U.S.C. §§ 11601-11610, divest this Court of its elemental power to deny relief to a litigant with "unclean hands" relative to the equitable remedy sought. I disagree, as I cannot accept that the Convention sub silentio undermines our power – and indeed, our obligation – to deny equitable relief to a petitioner who has engaged in unconscionable conduct directly bearing on the dispute between the parties. Accordingly, I would raise the unclean-hands doctrine sua sponte to dismiss Karpenko's petition based on her unscrupulous actions in willfully violating the custody orders of Pennsylvania courts, abusing Pennsylvania's legal processes, absconding with the parties' daughter, E.L., and denying E.L. all access to Leendertz, her father, since 2006. Because this unconscionable misconduct relates directly to Karpenko's claim for return of a child under the Hague Convention, it operates as a complete bar to her relief. Respectfully, I dissent.

I.

Both the Hague Convention and its available remedy – the return of a child – are equitable in nature. See Hazbun Escaf

v. Rodriquez, 200 F. Supp. 2d 603, 611 n.21 (E.D. Va. 2002).[1] As with other equitable remedies, therefore, Hague relief is subject to the equitable doctrine that "he who comes into equity must come with clean hands." Precision Instr. Mfg. Co. v. Aut. Maint. Mach. Co., 324 U.S. 806, 814 (1945) (quotation marks omitted). The doctrine of unclean hands is "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." Id. Courts close their doors "only for such violations of conscience as in some measure affect the equitable relations between the parties [relative to the relief sought]." Highmark, Inc. v. UPMC Health Plan, 276 F.3d 160, 174 (3d Cir. 2001) (quotation omitted). As we have often emphasized, the nexus "between the misconduct and the claim must be close." E.g., In re New Valley Corp., 181 F.3d 517, 525 (3d Cir. 1999).

Although the doctrine of unclean hands is frequently interposed as an equitable defense, we may raise the doctrine sua sponte, see Highmark, 276 F.3d at 174, to ensure that our equitable powers are "never . . . exerted in behalf of one who has acted fraudulently or who by deceit or any unfair means has

---

[1]See also, e.g., Bell v. Aerodex, Inc., 473 F.2d 869, 872 (5th Cir. 1973) ("[T]he remedy sought . . . dictate[s] whether the case will be considered an action at law or a proceeding in equity.").

gained an advantage," Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 245 (1933). As we have explained previously,

> the equitable doctrine of unclean hands is not a matter of defense to the defendant. Rather, in applying it[,] courts are concerned primarily with their own integrity, and with avoiding becoming the abettor of iniquity.

Ne. Women's Ctr., Inc. v. McMonagle, 868 F.2d 1342, 1354 (3d Cir. 1989) (citations and quotations omitted). Consequently, it is our prerogative, and even our obligation, to shut this Federal Court's doors "in limine" to a remedy-seeker who has committed "some unconscionable act [with an] immediate and necessary relation to the equity that he seeks." Keystone, 290 U.S. at 245.

Contrary to the majority's conclusion, the doctrine of unclean hands is fully applicable to litigation under the Hague Convention. Although the majority is correct that the unclean-hands doctrine is not among the Convention's enumerated exceptions, I presume that "Congress is knowledgeable about existing law pertinent to the legislation it enacts," Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 185 (1988), including the doctrines of equitable tolling and fugitive disentitlement, as well as the unclean-hands doctrine, applicable to suitors seeking equitable relief. Consequently, I do not share the majority's

3

difficulty in locating "any authority that would support dismissal of a Hague Convention petition on grounds of unclean hands." Maj. Op. at 11. The long arm of equity is present here. Indeed, the equitable nature of the Convention's remedy renders the unclean-hands doctrine fully applicable in Convention cases. Nothing in ICARA or the Convention specifies otherwise. That is all the "authority" I require.[2]

The majority is mistaken in assuming that Hague litigation is immune from traditional equitable doctrines. In Journe v. Journe, 911 F. Supp. 43 (D.P.R. 1995), a district court invoked its "equitable powers" and the doctrine of waiver to dismiss Dr. Journe's petition for the return of his children under the Hague Convention. Id. at 47-48. After his wife removed his children from France to Puerto Rico, Dr. Journe voluntarily dismissed his divorce and custody proceedings in French court. Id. at 48. In view of those facts, the court held that Dr. Journe "waived" his Hague remedy by "eschew[ing] [his] opportunity to resolve the custody dispute in his native France." Id. In the court's view, Dr. Journes's conduct evinced "an intent to relinquish his rights to have the custody issues decided by the courts of France." Id. Significantly, the court's waiver analysis afforded no special solicitude for Hague Convention claims. See

---

[2]See also Prevot v. Prevot, 59 F.3d 556, 566 (6th Cir. 1995) (leaving open the question whether "unclean hands" may be asserted as a "defense" or exception in a case under the Hague Convention).

4

id.

Courts have similarly invoked their equitable powers to deny Hague relief under the fugitive disentitlement doctrine. In Prevot v. Prevot, 59 F.3d 556 (6th Cir. 1995), the Court of Appeals for the Sixth Circuit applied the doctrine to reverse the district court's grant of the Hague petition of Mr. Prevot, a fugitive from the United States. Id. at 566-567. In the court's view, "nothing in the [Hague] Convention or [ICARA] . . . purports to strip an American court of the powers inherent to it as a court," including the powers to "react to abuses of American criminal process, to defiance of judicially-imposed obligations owed to victims of crime, and to flights from financial responsibilities to our government." Id. at 566. Other courts have followed suit. See Pesin v. Rodriguez, 244 F.3d 1250, 1253 (11th Cir. 2001) (applying the doctrine to dismiss the fugitive mother's appeal from the district court's order granting the father's Hague petition, reasoning that "[w]e cannot permit [her] to reap the benefits of a judicial system the orders of which she has continued to flaunt"); Sasson v. Shenhar, 667 S.E.2d 555, 564 (Va. 2008) (affirming the appellate court's dismissal of the father's Hague appeal on fugitive disentitlement grounds). Additionally, those courts that have declined to apply the disentitlement doctrine have done so based on specific factual circumstances, and have not determined the doctrine to be categorically inapplicable to claims of wrongful removal

under the Hague Convention.[3] In my view, these cases demonstrate that Hague litigation is subject to the full range of nonstatutory equitable doctrines applicable in other controversies. As indicated, because the return-of-child remedy is essentially equitable, a Hague petition is subject to equity's doctrine of unclean hands.

The majority finds the unclean-hands doctrine inapplicable in Hague litigation because it "would undermine the Hague Convention's goal of protecting the well-being of the child, of restoring the status quo before the child's abduction, and of ensuring 'that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'" Maj. Op. at 11-12 (quoting Hague Convention, art. 1(b)). But that argument proves too much. When we apply equitable doctrines to deny a remedy to which a claimant is otherwise entitled, we necessarily subordinate the

---

[3]See March v. Levine, 249 F.3d 462, 470 (6th Cir. 2001) (observing that "[g]iven the fundamental rights at issue, . . . disentitlement will generally be too harsh a sanction in a case involving an ICARA petition," and declining to disentitle the petitioner based on civil contempt orders unrelated to the parties' Hague dispute); Walsh v. Walsh, 221 F.3d 204, 216 (1st Cir. 2000) (holding that dismissal under the fugitive disentitlement doctrine would be "too harsh[,] particularly in the absence of any showing that the fugitive status has impaired the rights of the other parent").

6

substantive law to our Court's obligation to defend our jurisprudential reputation and integrity. Cases under the Hague Convention have been no exception. Thus, when courts have applied the fugitive disentitlement doctrine to Hague matters, they have subordinated Hague policies to deter "abuses of American criminal process," Prevot, 59 F.3d at 566, "promot[e] the efficient operation of the courts, discourag[e] flights from justice, and avoid[] prejudice to the other side caused by the appellant's fugitive status," Pesin, 244 F.3d at 1253. Likewise, at least one court has subordinated Hague policies to the policies underlying the doctrine of waiver. See Journe, 911 F. Supp. at 48. Unless the majority is prepared to exempt Hague litigation from the doctrines of both waiver and fugitive disentitlement, it lacks a principled basis for refusing to apply the unclean-hands doctrine on the ground that it "undermine[s]" Hague objectives. See Maj. Op. at 11.

The majority states that "fugitive disentitlement does not apply to Karpenko's conduct here," Maj. Op. at 11 n.5, but offers no justification for distinguishing between the equitable doctrines of fugitive disentitlement and unclean hands. I readily concede that the unclean-hands doctrine is inapplicable to some categories of lawsuits, as when litigants represent the public interest, e.g., Perma Life Mufflers v. Int'l Parts Corp., 392 U.S. 134, 138-139 (1968) (pari delicto defense unavailable in private antitrust cases because they "serve[] important public purposes"), or act as private attorneys general, e.g., ASPCA v. Ringling Bros. & Barnum & Bailey Circus, 244 F.R.D. 49, 53

7

(D.D.C. 2007) (unclean-hands defense unavailable in litigation under the Endangered Species Act because private litigants further "the overriding public policy in favor of protecting the animals"). But the rationale foreclosing the unclean-hands doctrine in those cases – that unclean hands should not bar a litigant from achieving a broad public benefit – is absent in individual cases under the Hague Convention. Nor can the majority's position be justified by reference to the magnitude of the rights implicated in Hague litigation. See Walsh v. Walsh, 221 F.3d 204, 216 (1st Cir. 2000) ("To bar a parent who has lost a child from even arguing that the child was wrongfully removed to another country is too harsh."). In my view, that magnitude heightens our profound obligation to ensure that this Court does not become an instrumentality of iniquity in relation to those rights.[4]

---

[4]Through the ages, great writers and dramatists have sounded the call for the intervention of relief now reflected by modern day equity precepts. "Rigorous law is often rigorous injustice," wrote the Roman playwright Terence (185-159 B.C.) in Heautontimorumenos act. iv, sc. 5, l. 48. Years later Cicero (106-45 B.C.) wrote that "'extreme law, extreme injustice' is now become a stale proverb in discourse." I. De Officiis, ch.10. This aphorism echoed in Jean Racine's 1664 observation that "extreme justice is often injustice." Frères Ennemies, act iv. sc. 3. Then came Voltaire in 1718: "Mais l'extrême justice est une extrême injure." Oedipus, act iii, sc. 3.

The majority is also concerned that application of the unclean-hands doctrine would be commonplace in Hague Convention matters, because wrongful removal "is most likely to occur when strained relations between parents are at their worst" and after "one or both parents may [have] interfere[d] with the other's custody rights." Maj. Op. at 12. They fear that the unclean-hands doctrine will eviscerate the Hague Convention's "remedy [for] prevent[ing] a cycle of abduction and re-abduction, an outcome which would inflict needless harm on vulnerable children." Maj. Op. at 12. But that argument assumes that we would apply the doctrine woodenly, without sensitivity to the acrimonious factual circumstances frequently attending Hague petition cases. Here, I heed the Supreme Court's admonition, in the fugitive disentitlement context, that courts must exercise "restraint," denying relief only as a "reasonable response to the problems and needs that provoke it." Degen, 517 U.S. at 823-824. Applying that teaching, I would not deny Hague relief as a matter of course whenever one parent has done something to "interfere with the other's custody rights," Maj. Op. at 12, as I agree that this may be relatively commonplace in heated custody battles. I accept that the unclean-hands doctrine must be applied with restraint, but I insist that it must be applied. Unless the Supreme Court instructs otherwise, I refuse to interpret the Hague Convention to afford unconditional relief to a litigant whose exceptional, inequitable, and reprehensible misconduct is a direct, but-for cause of the unlawful removal of which she complains.

9

The majority contends finally that, even if the Hague Convention is subject to the doctrine of unclean hands, it inappropriate in this case because "Leendertz engaged in precisely the type of conduct that the Hague Convention was designed to deter." Maj. Op. at 13. As a factual matter, I disagree. The majority acknowledges, but downplays, the fact that Leendertz removed his daughter to the United States in reliance on an order from a Pennsylvania court that purported to authorize him to "obtain custody of the child at any place that she may be found, [including "at her school,"] whether in the United States or any other country." App. 445-447. Significantly, it additionally specified that "[n]o further proceedings or any further orders shall be required for Father to obtain custody of the child." App. 445-447. Although the Pennsylvania court may have lacked the authority to enter an order with such a huge sweep, that order doubtless made this case of unlawful removal an exceptional one. Here, Leendertz did not eschew legitimate legal processes for self-help; he did not remove his child to the United States because he was unwilling or unable to obtain judicial relief. Indeed, given Leendertz's multi-year effort to gain access to his daughter through the court system, I doubt he would have removed the child to the United States but-for the Pennsylvania court's order purporting to authorize his actions. I am aware of no other case in which a Hague respondent effected an unlawful removal that was purportedly authorized by an American court. Under these circumstances, I conclude that Leendertz's conduct was qualitatively different from that which "Hague Convention was

10

designed to deter," Maj. Op. at 12, and I find the Convention's deterrence rationale completely inapplicable in this case.

In sum, I would hold that the doctrine of unclean hands is fully applicable in Hague Convention cases, as "[p]ublic policy . . . makes it obligatory for courts to deny a plaintiff relief once his 'unclean hands' are established." Gaudiosi, 269 F.2d at 882. Although I recognize that we must measure "unconscionable conduct" with sensitivity to the factual peculiarities of Hague cases, I would not except Hague litigation from this longstanding principle. I now turn to the application of these precepts to the uncontroverted facts of this case.

## II.

The equitable doctrine of unclean hands applies when a party seeking relief has committed an "unconscionable" act that is "immediately related to the equity the party seeks in respect to the litigation." Highmark, 276 F.3d at 174. Additionally, the nexus "'between the misconduct and the claim must be close.'" Id. (quoting New Valley, 181 F.3d at 525). I would hold that Karpenko's conduct in this case was both unconscionable and directly related to her petition for the equitable remedy of return of a child under the Hague Convention. Accordingly, I would reverse the District Court and remand for the entry of an order dismissing her petition.

In September 2002, Leendertz and Karpenko entered a

11

stipulation in which they agreed that Karpenko would have primary physical custody of the child in the Ukraine, subject to Leendertz's right to visit the child four times per year, for a total of thirteen weeks. Karpenko v. Leendertz, No. 09-03207, 2010 WL 831269, at *1 (E.D. Pa. Mar. 4, 2010) (District Court's Return Order & Opinion); see App. 265-267 (stipulation). The stipulation was entered as an Order of the Court by a judge of the Pennsylvania Court of Common Pleas. Karpenko, 2010 WL 831269, at *1. As agreed, Karpenko thereafter moved with the child to the Ukraine. Id. In May 2003, she relocated to the Netherlands, apparently at Leendertz's request. Id.

Since 2006, Karpenko has unconscionably denied Leendertz all access to the child, in complete violation of the parties' 2002 agreement and the laws of both the United States and Holland. See id. at *2. Additionally, when Karpenko moved with the child to a new address in the Netherlands in 2007, she did not provide Leendertz with her new address or telephone number. Id. In numerous telephone messages, Karpenko has threatened Leendertz that he will never see E.L again and has warned him that, if he tries to see her, Karpenko will change the child's name and get her a new passport. Id. Other evidence indicated that Karpenko maligned Leendertz and denied the child access even to Leendertz's relatives in the Netherlands. See App. 455. In my view this conduct is malicious and unconscionable; it goes far beyond a simple "interfere[nce] with [Leendertz's] custody rights." Maj. Op. at 12.

12

Karpenko also behaved unconscionably in disregarding the custody orders of Pennsylvania courts and manipulating those courts to her advantage. Not insignificantly, Karpenko first obtained the right to leave the United States with E.L. via the September 2002 order of the Pennsylvania Court of Common Pleas. See Karpenko, 2010 WL 831269, at *1-2. To obtain that right, Karpenko pledged that Leendertz would have rights of visitation and access and promised not to challenge the custody agreement. Id.; App. 266-267. That pledge proved entirely specious, however, as Karpenko went on to disregard each of her court-ordered obligations once she departed the United States. Karpenko first disregarded the court's order with respect to Leendertz's visitation rights; by 2006, she was determined to deny him any and all access to the child. See Karpenko, 2010 WL 831269, at *2. Then, in February 2008, she petitioned a Dutch court for sole custody of E.L., this time disregarding the Pennsylvania court's order insofar as it bound her not to challenge the parties' September 2002 agreement. See id. On May 23, 2008, Leendertz filed petitions in Pennsylvania court for Modification of a Custody Order and for Civil Contempt. Id. Karpenko sought a continuance of those proceedings, and in exchange for that continuance, Karpenko promised the court that she would permit Leendertz to visit with the child pending the full hearing. See App. 336, 405. Pursuant to that promise, the court entered an order granting Leendertz partial physical custody in the Netherlands during the week of October 26 to November 30, 2008. App. 429. But Karpenko's promise was yet another subterfuge; predictably, she defied the

13

court and refused to permit Leendertz to visit with his daughter. App. 452. In view of those circumstances, a Pennsylvania court entered a contempt order against Karpenko on May 20, 2009. Karpenko, 2010 WL 831269, at *2; App. 448-456. That court additionally awarded Leendertz full custody over E.L. and authorized him to "obtain custody . . . at any place that she may be found." Karpenko, 2010 WL 831269, at *2; App. 446.

When the District Court granted Karpenko's Petition for Return of Child, she very nearly succeeded in making the federal court system an "abettor" of her inequitable conduct. See Ne. Women's Ctr., 868 F.2d at 1354. As the District Court granted Karpenko's Hague petition, it observed, but apparently minimized, Karpenko's complete lack of credibility throughout the proceedings. Karpenko, 2010 WL 831269, at *3. Nevertheless, the District Court's subsequent Stay Order memorialized its distrust of the litigant who had achieved success on the merits of her Hague claim. In that order, the District Court assumed Karpenko would defy almost any court order adverse to her, emphasizing its "concern[] that the Mother [would] not comply with an Order from the Third Circuit ordering the child's return to the United States." Karpenko v. Leendertz, 2010 WL 996465, at *2 (E.D. Pa. Mar. 15, 2010) (District Court's Stay Order). To circumvent an adverse order, the Court predicted that "[t]he Mother may . . . flee with the child to an unknown location in Europe and change the child's name, as she has threatened to do in the past." Id. In my view, Karpenko's inequitable conduct toward Leendertz thus

14

continued as she invoked the District Court's power against him, while making it clear that she did not consider herself to be bound by its orders. Unlike my colleagues, I would not permit her to employ the power of the federal courts in this abusive manner. Additionally, in view of Karpenko's evident disdain for American courts, I believe it is only fitting to deny her "the benefits of a judicial system the orders of which she has continued to flaunt," Pesin, 244 F.3d at 1253, just as we do in fugitive disentitlement cases.

Karpenko's petition under the Hague Convention is but her latest effort to make American courts the instrumentalities of her inequitable conduct. In my view, we are duty-bound to deny Karpenko all equitable relief in view of her unconscionable and fraudulent conduct – her manipulation of the American legal process, her defiance of court orders, and her unrelenting iniquity toward Leendertz. It is plain that Karpenko seeks equity in this Court after she "gained an advantage" by "act[ing] fraudulently, [by] deceit, [and by] unfair means." Keystone, 290 U.S. at 244-245. I would hold that Karpenko's unclean hands bar us from hearing her case, much less granting her requested relief. Accordingly, I would remand these proceedings to the District Court for entry of an order dismissing Karpenko's petition. For the reasons heretofore stated, I respectfully dissent.